United States District Court
Southern District of Texas
**ENTERED**
September 27, 2017
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **VS.** | § | **CRIM. ACTION NO. 5:17-CR-00507** |
| | § | |
| **JOSE AMANDO GARCIA-GONZALEZ, *et al.*,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION

On July 6, 2017, a federal grand jury returned a three-count indictment against Defendants Jose Amando Garcia-Gonzalez ("Garcia-Gonzalez") and Jesell Lynn Hinojosa ("Hinojosa"), charging them with conspiring to transport an undocumented alien, along with two related substantive counts, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (v)(I), and (v)(II). (Dkt. No. 29 ("Indictment")).

Each Defendant filed a "Motion To Suppress Stop and Evidence." (Dkt. Nos. 36, 38). Senior District Judge George Kazen referred the motions to the undersigned. (Dkt. Nos. 37, 40). The government filed responses (Dkt. Nos. 43, 44) pursuant to Orders of this Court (Dkt. Nos. 39, 41). On August 14, 2017, the undersigned held a Motions Hearing at which the parties presented argument and evidence, and one government witness testified. (Dkt. Nos. 45, 46, 47). The Court has considered the argument, evidence, testimony, and applicable law. For the reasons that follow, the undersigned **RECOMMENDS** that the District Judge **DENY** Garcia-Gonzalez's and Hinojosa's Motions To Suppress Stop and Evidence (Dkt. Nos. 36, 38).

## FACUTAL BACKGROUND

On June 11, 2017, at approximately 11:30 a.m., United States Border Patrol Agent ("BPA") Jose Gonzalez ("BPA Gonzalez") was working highway interdiction, approximately ten (10) miles south of the city of Zapata. (Mot. Hr'g at 1:24:15 PM – 1:24:49 PM; Mot. Hr'g at 1:58 PM – 2:00 PM). He was parked in a marked patrol vehicle perpendicular to Farm-to-Market Road ("FM") 2687 and U.S. Highway 83, observing traffic without radar. (*Id.*). He testified that, from his position, he could view the Rio Grande River, which was approximately three (3) miles away. (Mot. Hr'g at 1:22 PM – 1:23:37 PM). The river, which runs parallel to U.S. Highway 83, can be up to ten (10) miles away from other parts of U.S. Highway 83. (*Id.*). There are many gravel roads connecting the river and the highway. (*Id.*).

BPA Gonzalez testified that he observed a beige Chevy Impala driving north along U.S. Highway 83 shortly after 11:30 a.m. (Mot. Hr'g at 1:24 PM – 1:25 PM). He noticed that the vehicle was "heavily dirty," which, in his experience, is consistent with vehicles traveling on the gravel roads leading to and from the river. (Mot. Hr'g at 1:24:49 PM – 1:25:26 PM).

BPA Gonzalez estimated that the Chevy passed him driving at a rate of approximately 60 miles per hour during a span of three or four seconds. (Mot. Hr'g at 1:59:37 PM – 2:01 PM). Having the experience of working this highway for many years, he did not recognize the Chevy as being a local vehicle. (Mot. Hr'g at 1:21:45 PM – 1:26:31 PM; Mot. Hr'g at 1:31:18 PM – 1:31:44 PM). As such, BPA Gonzalez deemed this vehicle to be a commuter vehicle, which he defined as a vehicle that travels from point "A" to point "B." (Mot. Hr'g at 1:25:26 PM – 1:26:31 PM). From the agent's experience, such drivers travel either at the speed limit of 75 miles per hour or a little above the limit. (*Id.*). BPA Gonzalez regarded the Chevy's driving as

"erratic," because its velocity was "excessively" below the typical speed for a commuter vehicle. (Mot. Hr'g at 1:26 PM – 1:27 PM, 1:44 PM – 1:46 PM).

The agent suspected something further amiss about the Chevy because it appeared "very laden," or heavy in the back, where the wheels were almost touching the fender. (Mot. Hr'g. at 1:27:10 PM – 1:30:18 PM). BPA Gonzalez testified that sedans are not designed to carry a heavy load in the trunk area of the car, and there has to be weight directly on the back of the vehicle to cause it to ride low in that area. (*See id.*). Since he had only observed three subjects in the vehicle—a driver, a front-seat passenger, and a rear-seat passenger—this added to his suspicion. (Mot. Hr'g at 1:24 PM – 1:28 PM, 1:46 PM – 1:47 PM).

At first glance, BPA Gonzalez observed the vehicle's passengers "staring intently forward and sitting upright." (Mot. Hr'g at 1:25:21 PM – 1:25:26 PM). BPA Gonzalez turned north to observe the Chevy more closely. (Mot. Hr'g at 1:26:31 PM – 1:30:41 PM). It took the agent three (3) miles, or approximately two (2) or three (3) minutes, to "approach the vehicle from the rear" to get a "second glance." (Mot. Hr'g at 1:28:30 PM – 1:28:49 PM). The agent was mentally articulating additional characteristics to make a reasonable stop *en route*—the vehicle was heavily laden; there were numerous subjects; the vehicle was dirty; and the driver was erratic. (1:27:50 PM – 1:28:11 PM).

After BPA Gonzalez caught up to the Chevy "from the rear," he then approached the vehicle from the innermost lane, thereby providing the agent with a good observation of the Chevy's occupants as he drove alongside the vehicle. (Mot. Hr'g at 1:29 AM – 1:30:15 PM). The driver was still staring intently forward; the rear-seat passenger was staring straight forward as "if rigid"; and the front-seat passenger reacted by sitting straight up. (*Id.*).

As BPA Gonzalez followed the vehicle into Zapata, he switched lanes to position his patrol vehicle behind the Chevy to gain a better look at its occupants from the rear again. (Mot. Hr'g at 1:30:14 – 1:36:11 PM). Once again behind the Chevy, BPA Gonzalez noticed that the driver adjusted his rear-view mirror to focus on the agent, thereby paying more attention to the agent than the highway. (*Id.*) The driver of the Chevy began to apply his brakes in response to the agent following him. (*Id.*). This stretch of the road has a speed limit of 55 miles per hour that decreases to 45 miles per hour. (Mot. Hr'g at 1:30:56 PM – 1:31:18 PM). However, the driver made a dramatic deceleration to about thirty (30) to twenty-five (25) miles per hour. (Mot. Hr'g at 1:30:14 – 1:36:11 PM). The agent verified this by reading his speedometer. (*Id.*). The front seat passenger was now sitting upright "exaggeratedly." (*Id.*). The rear-seat passenger was maintaining his position, staring straightforward. (*Id.*). The agent, while following the Chevy into the city of Zapata, expected that the occupants might have at least communicated or interacted with one another to some degree during his time following them. (*Id.*). But such was not the case; smugglers, according to the agent, tell undocumented aliens to do and say nothing—to be quiet—according to his experience. (Mot. Hr'g at 1:32:50 PM – Mot. Hr'g at 1:34 PM).

Another indicator that heightened the agent's suspicion of criminality was that he noticed several handprints of various sizes covering the dirty trunk of the Chevy. (Mot's Hr'g at 1:34 P.M. – 1:35 PM, 1:37:29 PM). These handprints were near the key hole, bottom bumper, and on the top of the trunk. (*Id.*). This was relevant because BPA Gonzalez testified that he has made stops where the undocumented aliens had been put in the trunk. (Mot. Hr'g at 1:34:30 PM).

Finally, from his experience, BPA Gonzalez testified that U.S. Highway 83 is a corridor where smugglers move undocumented aliens and narcotics from the Rio Grande Valley or south

of Zapata to the North. (Mot. Hr'g at 1:32 PM – 1:34 PM). The agent further testified that he knew for sure that criminal activity was afoot when the car slowed dramatically. (*Id.*). Shortly thereafter, the agent conducted a traffic stop of the Chevy Impala. (Mot. Hr'g at 1:33:54 PM). Jose Amando Garcia-Gonzalez and Jesell Lynn Hinojosa were identified as the driver and front seat-passenger, respectively. (Mot. Hr'g at 1:24:15 PM – 1:24:49 PM; Mot. Hr'g at 1:58 PM – 2:00 PM). A total of four undocumented aliens were found in the Chevy, including two that were concealed in the trunk area. (Govt.'s Ex. 2–4).

## LEGAL STANDARD

The Fourth Amendment provides that "'[t]he right of the people to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .'" *Bond v. United States*, 529 U.S. 334 (2000) (quoting U.S. CONST. amend. IV). In the instant case, since BPA Gonzalez conducted an investigatory stop without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the investigatory stop was constitutional. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). A United States Border Patrol agent's temporary detention of an occupant of a vehicle for investigatory purposes while on roving patrol is constitutional if, at a minimum, the agent reasonably suspects that an occupant of the vehicle is involved in illegal activity. *Id.* An unparticularized suspicion or hunch will not suffice; however, proof that an occupant of the vehicle is involved in illegal activity by a preponderance of the evidence is not required. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence."); *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999) ("Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of

the evidence"). Rather, the agent's suspicion is reasonable if it is based on specific articulable facts and rational inferences that can be drawn therefrom. *See, e.g.*, *Brignoni-Ponce*, 422 U.S. at 884; *United States v. Chavez–Chavez*, 205 F.3d 145, 147 (5th Cir. 2000).

A court may take into account *any* number of factors when determining whether an agent's suspicion was reasonable. These factors *may* include, but are not limited to: "(1) an agent's experience in detecting illegal activity; (2) proximity of the area where the investigatory stop occurred to an international border; (3) the area's known characteristics for illegal activity; (4) information about recent illegal activity in the area; (5) the area's usual traffic patterns; (6) erratic driving or obvious attempts to evade agents; (7) the type of vehicle and other characteristics of the vehicle known to the agents to be frequently used in illegal activity including whether the vehicle is riding low or its suspension is modified; [and] (8) the number, appearance, and behavior of the occupants of the vehicle." *Guerrero-Barajas*, 240 F.3d at 432–33 (setting forth the *Brignoni-Ponce* factors as viewed by the Fifth Circuit). *See also United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975). No single factor is determinative. *Guerrero-Barajas*, 240 F.3d at 432–33.

A court must examine each case based on the totality of the circumstances known to the agent when he made the investigatory stop and his experience in evaluating such circumstances. *Id.* The Fourth Amendment does not require an agent to eliminate all reasonable possibilities of legal activity before conducting an investigatory stop, nor must every factor weigh in favor of illegal activity for an agent to reasonably suspect that an occupant of a vehicle was involved in an illegal activity. *Id.* Further, a court must neither count the factors that favor reasonable suspicion nor subtract the countervailing factors from the sum total of the favorable factors because reasonable suspicion is not mathematical; rather, the reasonable suspicion analysis is a

"fact-intensive test" in which the court looks at "all circumstances together" to weigh *not* the individual layers but the "laminated total." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001). In assessing the totality of circumstances, courts look to the "collective knowledge" of all agents, *United States v. Hernandez,* 477 F.3d 210, 215 n.13 (5th Cir. 2007), and adjudicate the facts "against an objective standard," *United States v. Gomez*, 776 F.2d 542, 546 (5th Cir. 1985). Otherwise, the court may arrive at an impermissible conclusion of reasonable suspicion "simply by piling hunch upon hunch." *United States v. Ross,* 400 F. Supp. 2d 939, 947 (W.D. Tex. 2005) (internal quotation omitted).

## DISCUSSION

Fifth Circuit law in roving patrol cases is based on *Brignoni-Ponce*. The Court thus begins its analysis of reasonable suspicion in the instant roving patrol stop with these factors.

1. *An agent's experience in detecting illegal activity.*

The Fifth Circuit has held that an officer's experience contributes to "determining whether reasonable suspicion exists." *United States v. Aldaco*, 168 F.3d 148, 151 (5th Cir. 1999). BPA Gonzalez is at least a nine-year, veteran Border Patrol agent who has been stationed in Zapata, Texas, throughout his career with the agency. (Mot. Hr'g at 1:19 PM). He has received specialized training on the legality of border patrol and traffic stops, through the study of common law and federal regulations. (Mot. Hr'g at 1:19:24). After being discharged from the military, BPA Gonzalez earned a Bachelor of Science in Psychology, and he is currently pursuing a Master's in Mental Health Counseling. (Mot. Hr'g at 1:20 PM – 1:21 PM). The agent's current duties involve patrolling the Texas-Mexico border, which includes patrolling the brush land and conducting roving patrol stops on U.S. Highway 83—a stretch of highway that extends from Falcon Heights to Webb County, Texas. (Mot. Hr'g at 1:20:30 PM – 1:21:40 PM).

BPA Gonzalez has apprehended over thirty alien or narcotic smugglers in roving patrol stops in 2017 (this year) alone. (Mot. Hr'g at 1:18:46 PM – 1:23 PM). The agent's training and experience are relevant because "a finding of reasonable suspicion must be based on the 'totality of the circumstances known to the agent and the agent's experience in evaluating such circumstances.'" *United States v. Jones*, 149 F.3d 364, 367 (5th Cir. 1998) (quoting *United States v. Casteneda,* 951 F.2d 44, 47 (5th Cir.1992)). This factor, when viewed charily, or most carefully, supports the reasonableness of the agent's suspicion.

2. *Proximity to the border.*

The Fifth Circuit has held that "[p]roximity to the border is a paramount factor in determining reasonable suspicion." *United States v. Garza*, 727 F.3d 436, 441 (5th Cir. 2013) (internal quotations omitted). Here, BPA Gonzalez was patrolling a stretch of Highway 83 about ten (10) miles south of Zapata, Texas. This particular stretch of highway runs parallel to the Rio Grande River and is approximately three (3) miles north of the international border between the United States and Mexico. (Mot. Hr'g at 1:23 PM – 1:24 PM). A stop that occurs in very close proximity to the border generally implicates the proximity factor. *See, e.g., United States v. Serrano-Villalobos,* 326 F. App'x 274, 275 (5th Cir. 2009) ("The fact that the agent observed the vehicle exiting from a ranch that borders the Rio Grande 'contributes significantly' to the reasonableness of the agent's suspicion."); *United States v. Jackson*, 825 F.2d 853, 855–56 (5th Cir. 1987) ("[A]long much of the Mexican-United States border runs the Rio Grande River, which, in spite of a name indicating contrary magnificence, can be driven across, waded across, and easily swim across at all times, and much of the time can be walked across without wetting a foot.") (internal quotation omitted); *United States v. Salazar*, 628 F. App'x 265, 266 (5th Cir. 2015) ("Stopping [a] vehicle as it move[s] away from the border, within 50 miles of it, creates a

stand-alone inference that the vehicle's journey originated at the border.") (internal quotation omitted). The Chevy's close proximity to the Rio Grande River contributes to the reasonableness of the agent's suspicion.

3. & 4. *The area's known characteristics for illegal activity and information about recent illegal activity in the area.*

An example of a known characteristic that an officer making a stop may consider when he encounters a vehicle is an area's reputation as an alien or drug smuggling corridor. *See United States v. Aldaco*, 168 F.3d 148, 152 (5th Cir. 1999) (finding that a "road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion."). Here, BPA Gonzalez also testified that U.S. Highway 83 is a corridor used to move undocumented aliens and narcotics from the Rio Grande Valley or the area south of Zapata to up North. BPA Gonzalez testified that, from U.S. Highway 83, there are "numerous roads that lead to and from the Rio Grande River." (Mot. Hr'g at 1:23:16 PM – 1:24:49 PM).

The Fifth Circuit has concurred that U.S. Highway 83 is a "notorious smuggling route." *United States v. Hernandez*, 477 F.3d 210, 211 (5th Cir. 2007). "[A]liens follow ranch or county roads or walk about six hours through the desert from the Rio Grande, approximately eighteen miles away, for pickup by smugglers on U.S. 83, north of any checkpoint." *Id.* at 211–12. That the Chevy Impala was traveling north along this stretch of U.S. Highway 83, a notorious smuggling route, contributes to the reasonableness of the agent's suspicion that illegal activity was afoot.

5. *Behavior of the driver and the number, appearance, and behavior of the occupants of the vehicle.*

BPA Gonzalez testified that the Chevy passengers were non-communicative, rigid, and staring straight ahead as he observed them. The agent also testified that the driver became more preoccupied with the agent, watching through his rear-view mirror instead of concentrating on the highway. The Fifth Circuit, however, has held that a mere psychological assessment, without more, provides insufficient cause to believe that an occupant is engaged is engaged in criminal activity. *United States v. Portillo-Aguirre*, 311 F.3d 647, 657 (5th Cir. 2002); *see also United States v. Orozco*, 191 F.3d 578, 582 (5th Cir. 1999) ("We have held that while slouching, alone, may not be a significant factor we look to overall behavior of the vehicle driver.").

First, the agent's observation that the passengers were rigid, stoic, non-communicative, and staring intently at the road does not tip the scales of justice in favor of reasonable suspicion. *See, e.g., Portillo-Aguirre*, 311 F.3d 657 ("[S]itting in an erect and rigid fashion and looking straight ahead does not [constitute] reasonable suspicion."); *United States v. Leija*, 735 F. Supp. 701, 703 (N.D. Tex. 1990) (finding that the agent's testimony that the occupants looked both stoic and nervous did not seem logically possible); *United States v. Alvarado*, 635 F. Supp. 2d 586, 592 (W.D. Tex. 2009) (finding that all occupants of a vehicle appeared to be rigid and none of them looked toward the border patrol car (i.e., the "ostrich syndrome") did not weigh in favor of reasonable suspicion).

Second, that Garcia-Gonzalez "continually glanced back" at BPA Gonzalez in his rear-view mirror "does not give rise to reasonable suspicion." *United States v. Jones*, 149 F.3d 364, 370 (5th Cir. 1998). When an agent's actions are such "that any driver, whether innocent or guilty, would be preoccupied with [the agent's] presence, then any inference that might be drawn from the driver's behavior is destroyed." *Id.* Moreover, "eye contact [or the avoidance thereof]

may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. *United States v. Orozco*, 191 F.3d 578, 582 (5th Cir. 1999). *See also United States v. Nichols*, 142 F.3d 857, 871 (5th Cir. 1998) ("[A]voidance of eye contact is entitled to no weight in the determination of reasonable suspicion.").

Here, in the instant case, there is more than mere psychological assessment from which one could deduce that Defendants were engaged in criminal activity. When BPA Gonzalez first viewed the Chevy traveling north on U.S. Highway 83, it appeared that the vehicle was travelling well below the speed limit. In the agent's experience, he believed that a "commuter" vehicle generally travels at or a little above the speed limit. More importantly, when the vehicle was entering into Zapata and the driver began to watch the agent through his rear-view mirror, Garcia-Gonzalez dramatically decreased his speed to around 25 to 30 miles per hour—at least 20 miles below the posted speed limit. In fact, the final observation that caused BPA Gonzalez to believe that criminal activity was involved was when the driver made a final dramatic decrease in speed. All of this behavior, considered together, supports the agent's suspicion of illegal activity.

6. <u>*The particular aspects of the vehicle*</u>.

BPA Gonzalez first noticed that the Chevy was "very laden" or riding low. (Mot. Hr'g at 1:27 PM – 1:27:22 PM). In other words, the vehicle was heavy in the back where "the wheels were almost touching the fender." (*Id.*). Again, BPA Gonzalez explained that sedans, such as the Chevy Impala, are not designed to carry a heavy load in the trunk area, and there has to be weight directly in the back of the vehicle to cause it to ride low in that area. (1:49:54 PM – 1:51:01 PM). The agent suspected the possibility of illegal activity because he noted only one passenger in the rear-seat of the vehicle, suggesting the possibility that aliens or narcotics were

being smuggled. *See, e.g., United States v. Leija*, 735 F. Supp. 701, 703 (N.D. Tex. 1990) (that aliens or narcotics were "stored or hidden away in the trunk area . . . ultimately cause[d] the vehicle's rear end to be laden down"). The Fifth Circuit has recognized that a "vehicle's heavily-laden appearance may support a finding of reasonable suspicion. . . ." *United States v. Ceniceros*, 204 F.3d 581, 585 (5th Cir. 2000). The agent further testified that he apprehended numerous undocumented aliens in the past based on this aspect of the vehicle alone. (Mot. Hr'g at 1:24 PM – 1:28 PM, 1:46 PM – 1:47 PM).

Finally, BPA Gonzalez noticed hand prints of various sizes on different areas of Chevy's dusty or dirty trunk, thereby causing him to suspect that criminal activity may have been afoot. (Mot. Hr'g at 1:33:58 PM – 1:37:55 PM). *See, e.g., United States v. Upchurch*, 14 F.3d 54 (5th Cir. 1994)("The agents also observed hand prints in the dust on the vehicle's trunk, which [Agent] Moore believed had recently been opened and closed, 'from the fresh look of the prints,' [thereby contributing to reasonable suspicion]."). These hand prints further buttresses BPA Gonzalez suspicion because he testified that he has made numerous stops where he has found undocumented aliens in trunks of vehicles, which he considered inhumane. (Mot. Hr'g. at 1:33:58 PM – 1:35 :12 PM).

While Defendants argue that an innocent explanation can justify these handprints (Mot. Hr'g at 2:24 PM – 2:25 PM), the Fifth Circuit has recognized that factors "that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Jacquinot*, 258 F.3d 423, 427–28 (5th Cir. 2001). In this particular situation, the Court of Appeals has stated that "hand prints in the dust on the vehicle's trunk" can contribute to reasonable suspicion." *Upchurch*, 14 F.3d at 54. *See, e.g., United States v. Carroll*, 591 F.2d 1132, 1135 (5th Cir. 1979) ("[T]he dust and

mud on the vehicle . . . were found to constitute reasonable suspicion.") (citation omitted); *United States v. Saenz*, 578 F.2d 643, 645 (5th Cir. 1978) ("[The] car was covered with dust and mud, leading the officers to believe that the vehicle was coming from an unpatrolled river area near the border."). The agent testified that these handprints caused him to suspect that one or more of the vehicle's occupants might have been smuggling aliens in light of his specialized training and experience. (Mot. Hr'g at 1:24 PM – 1:25 PM, 1:31 PM – 1:38 PM). When viewed charily, BPA Gonzalez's observation of handprints on a dirty, heavily laden vehicle, weighs in favor of the reasonableness of the agent's suspicion.

## CONCLUSION

The Fourth Amendment's core function is to safeguard the privacy and security of individuals from intrusive and arbitrary invasions by governmental officials. *Brignoni-Ponce*, 422 U.S. 873 (1975). The Fourth Amendment extends to protect the innocent and guilty alike. The government must prove that an investigatory stop is supported by reasonable suspicion. While this is an extremely close call, the undersigned finds that the government established its burden of proof. "[W]hen all of [the *Brignoni-Ponce*] factors are considered of one piece, the outline of a picture begins to emerge, especially to the eyes of [a] trained law enforcement officer[], which create[s] . . . reasonable suspicion." *United States v. Vega*, 254 F.3d 70 (5th Cir. 2001). Based on the totality of the circumstances and, in particular, the *Brignoni-Ponce* factors, BPA Gonzalez possessed sufficient reasonable suspicion to warrant the stop of the Chevy Impala. Accordingly, the undersigned **RECOMMENDS** that the District Judge **DENY** Garcia-Gonzalez's and Hinojosa's Motions To Suppress Stop and Evidence (Dkt. Nos. 36, 38).

**IT IS SO ORDERED.**

**SIGNED this 26th day of September, 2017.**

THE HONORABLE J. SCOTT HACKER
UNITED STATES MAGISTRATE JUDGE